UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY  DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. ) | |
| PEGGY ABNER and LINDA KENDALL, ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | 4:05-cv-106-RLY-WGH |
| ) | |
| JEWISH HOSPITAL HEALTH CARE ) | |
| SERVICES, INC. and SCOTT MEMORIAL ) | |
| HOSPITAL, ) | |
| Defendants. ) | |

**ENTRY ON SCOTT MEMORIAL'S MOTION FOR SUMMARY JUDGMENT**

This is a *qui tam* action brought by relators, Peggy Abner ("Abner") and Linda

Kendall ("Kendall") (collectively "Relators"), against defendants, Jewish Hospital Health

Care Services, Inc. ("Jewish Hospital") and Scott Memorial Hospital ("Scott Memorial"),

alleging healthcare fraud and retaliation in violation of the False Claims Act (the "FCA"),

31 U.S.C. § 3729 *et seq.*  Scott Memorial now moves the court for summary judgment in

its favor pursuant to Federal Rule of Civil Procedure 56.  For the reasons set forth below,

Scott Memorial's motion must be **GRANTED**.

I.     **Summary Judgment Standard**

A party is entitled to summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to

1

judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The non-moving party, however, may not rest on mere allegations or denials in its pleadings, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

A genuine issue of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Factual disputes that are irrelevant or unnecessary to the claims before the court will not alone defeat a summary judgment motion.  *Id.* at 247-48. When determining whether a genuine issue of material fact exists, the court views the record and all reasonable inferences in the light most favorable to the nonmoving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003).

Summary judgment is also proper, indeed it is mandated, when it is clear that the plaintiff will be unable to satisfy the legal requirements necessary to establish his case. *See Celotex*, 477 U.S. at 322.  Under this scenario, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.  The moving party is, therefore, entitled to judgment as a matter of law due to the nonmoving party's failure to make a sufficient showing on an essential element of which she carried the burden of proof.  *Id.*

## II.  Local Rule 56.1

2

Summary judgment motions filed in this district are governed by Local Rule 56.1, which sets forth a specific procedure for the presentation of material facts. Scott Memorial complied with Local Rule 56.1 by including in its brief a section labeled "Statement of Material Facts Not in Dispute." *See* L.R. 56.1(a). In turn, Local Rule 56.1 required Relators, as the nonmoving party, to respond to Scott Memorial's properly supported summary judgment motion with a brief that included a section labeled "Statement of Material Facts in Dispute." *See* L.R. 56.1(b). In this section, Relators should have identified "the potentially determinative facts and factual disputes which the nonmoving party contends demonstrate that there is a dispute of fact precluding summary judgment." *Id.* These factual assertions should have been "supported by appropriate citations" to the record or other competent evidence submitted with their brief. *Id.* The court has no duty to search and consider any part of the record not specifically cited in the manner proscribed by Local Rule 56.1. L.R. 56.1(e).

Relators's response brief fails to meet these basic and essential requirements. In their section labeled "Material Facts in Dispute," Relators state:

> Plaintiffs take issue with many of the factual representations made by Defendant, Scott Memorial, some of which are either taken out of context, and others which have no legal significance in this action or are completely untrue. However, because they are so frequent in number Plaintiffs will only mention them in this section but address them factually or legally in the body of this brief. There are also other facts which are material which will be forwarded in this pleading.

(Relators' Response Brief at 7). Relators then go on to list twenty argumentative statements such as, "Kendall's write up in June had nothing to do with her termination in

3

December" and "Plaintiffs' actions are protected activities."  (*Id.* at 7-8).  Only two of the twenty statements ("Plaintiffs have sufficient knowledge of false billing to file claim" and "Cindy Bush'[sic] purported knowledge of Medicare regulations is immaterial") are supported by factual assertions with appropriate citations.  (*Id.* at 7, letters A, C).  The other "material facts" set forth by Relators are woven throughout their thirty-seven pages of argument.  In fact, the majority of Relators' "argument" section is merely a lengthy summary of deposition testimony.

As a consequence of Relators' failure to comply with the requirements of Local Rule 56.1, the court assumes that Scott Memorial's Statement of Material Facts is undisputed and will accept the included facts, except to the extent that Relators have specifically controverted them or where the parties' arguments reveal that there is an obvious dispute.  *See* L.R. 56.1(e).  Even though the court is accepting Scott Memorial's Statement of Material Facts, the underlying facts alleged have still been taken in the light most favorable to Relators, with all reasonable inferences drawn in their favor.  *See Brengettcy v. Horton*, 423 F.3d 674, 681 (7th Cir. 2005).

## III.   Statement of Facts

### A.   Relators' Knowledge Concerning Scott Memorial's Billing Procedures

1.   Kendall was employed as a lab technician at Scott Memorial from 2001 to 2004. (Deposition of Linda Kendall ("Kendall Dep.") at 52, 172).  She never worked for the Billing Department and did not have access to the Billing Department's records.  (*Id.* at 186, 188-89).  She has no information that indicates one way or

another about what was or was not billed to Medicare or Medicaid by the Billing Department.  (*Id.* at 186-87).  She does not know what steps or procedures implemented by the Billing Department may prevent a bill from being sent to Medicare or Medicaid after it leaves the Lab Department.  (*Id.* at 191).  She does now know if all of the patients identified in the Amended Complaint are Medicare or Medicaid patients.  (*Id.* at 184).

2.      Kendall was sometimes asked by the lab secretary to confirm if a particular test was completed or not.  (*Id.* at 187).  On occasion, she would also review the printout of the prior day's tests to ensure tests were completed properly, as a check system to prevent incorrect billing.  (*Id.* at 156, 187-88).

3.      Abner was employed as a phlebotomist at Scott Memorial from September 2003 to January 2004 and again from June 2004 to December 2004.  (Deposition of Peggy Abner ("Abner Dep.") at 13-14, 167).  She also acted as lab secretary for a short period of time in 2004.  (*Id.* at 138).  She never worked in the Billing Department.  (*Id.* at 72).

4.      When acting as lab secretary, Abner was responsible for reviewing a printout of the tests that had been inputted into the computer the previous day to ensure that the information was correct.  (*Id.* at 67).  If there were problems, she would discuss them with Paul Pierce ("Pierce"), the lab manager.  If he agreed that there was a problem, she would hand-carry a correction to the Billing Department.  (*Id.* at 80).

5.      Abner was able to pull up a patient's number on the computer, see what test was

5

ordered, whether it was completed, how much was charged for the test, and the initials of the person who billed it. (*Id.* at 70-71). She does not know whether the billed amount she saw on her computer was actually submitted to Medicare or Medicaid by the Billing Department. (*Id.* at 97).

6.  Abner complains that specimens "farmed out" to Lab Corp for analysis were billed before the test results were received, but admits that she does not know if the government permits tests to be billed as soon as the specimen is drawn. (Abner Dep. at 91-92, 98-101). Abner does not know what the procedure is at Scott Memorial regarding billing for tests in process and she did not do anything to confirm whether a bill was ever actually sent out for a test that was never completed. (*Id.* at 92-97).

### B.    Scott Memorial's Billing Procedures

7.  Cindy Bush ("Bush"), Director of Patient Accounts for Scott Memorial, manages the Billing Department. (Deposition of Cindy Bush ("Bush Dep.") at 8-9). The Billing Department uses SSI software that is independent of the SSI software used by the Lab Department. (*Id.* at 9-11, 14, 40, 46-48). The Billing Department software uses a separate server housed in Bush's office, and is accessible only to the Billing Department. (*Id.*).

8.  Once a patient is registered, a department (such as the Lab Department) enters a service into the mainframe system used by every department except for the Billing Department. (*Id.* at 15). Once the service in entered, there is a separate

6

confirmation of the doctor's order that is performed by the Medical Records Department, under the supervision of Tammie Shelley ("Shelley"), called "coding." (*Id.* at 15, 50, 53, 56; Deposition of Tammie Shelley ("Shelley Dep.") at 13, 84-85). The Medical Records Department obtains a paper copy of the order and enters the proper diagnosis code for the order. (Bush Dep. at 51-52, 54; Shelley Dep. at 24-25). Four days after the service has been entered and properly coded, a bill is transferred to the SSI billing system. (Bush Dep. at 15, 50). If any one of the foregoing steps is missed, the charge will not transfer to the SSI billing software and the account cannot be billed. (*Id.* at 50). If there was no doctor's order in the file for a lab test, it could not be billed, as the Medical Records Department would be unable to enter the required diagnosis code. (*Id.* at 51, 53, 56).

9. After the information is transferred to the SSI billing software, the SSI billing system generates a Universal Billing Form (the "UB"), which is used to submit both private-pay and government-pay bills. (*Id.* at 15-18, 20-21). The Billing Department communicates with department heads to insure proper crediting and billing of patient accounts. (*Id.* at 21). If a service is never completed or is improper, the account is written off by the Billing Department. (*Id.* at 32, 38-39). With respect to services performed by the Lab Department, the lab secretary and/or the lab manager are usually the individuals who inform the Billing Department that a credit is needed. (*Id.* at 32).

10.     All Lab Department personnel were also directed through a memorandum to detect, resolve, and/or report any errors or problems with specimens.  (Deposition of Paul Pierce ("Pierce Dep.") at 172-73).

11.     The SSI billing software has internal edits that identify problems a particular bill may have according to which pay source will be billed, i.e., Medicare, Medicaid, or private insurance companies.  (Deposition of Angie Doan ("Doan Dep.") at 7-9).  If a lab test is determined to be incorrect or improper after it has been submitted for payment, a credit or adjustment to the account is made through the Medicare online system.  (*Id.* at 27-29).

12.     Bush is familiar with the Centers for Medicare and Medicaid Services' ("CMS") guidelines regarding billing for lab tests and attends Medicare seminars on a yearly basis to receive training on standards for government billing.  (Bush Dep. at 22-26).  As soon as a specimen is drawn, a test may be billed for; the results of the test do not have to be received prior to billing.  (*Id.* at 27).  A test is considered "in process" once the specimen is drawn and it may be billed for at that point.  (*Id.* at 29).

## C.     Kendall's Conduct

13.     Kendall did not believe that Pierce was a good candidate for the lab manager position.  (Kendall Dep. at 62).  Kendall spoke with other lab personnel about her perception of Pierce's technical abilities and her opinion that things were not being done correctly in the Lab Department.  (*Id.* at 64, 66).

8

14.   Kendall first noticed problems in the Lab Department in January 2002.  (*Id.* at 61).
Prior to June 2004, Kendall took problems she saw directly to Pierce.  (*Id.* at 63-
64, 81, 82-83, 97).

15.   Kendall made photocopies of the Lab Department's urinalysis quality control logs
for the year 2003 and took the photocopies home.  (*Id.* at 195).  Kendall took these
logs to help her demonstrate that Pierce lacked the technical abilities to perform
his job.  (*Id.* at 196).

16.   In June 2004, Kendall first spoke with Pierce and Dr. Emma Coronel ("Dr.
Coronel"), Medical Director of the Lab, about her concerns regarding quality
issues in the Lab Department.  (*Id.* at 63, 69).  Her primary complaint was that the
quality of the work in the Lab Department had been deteriorating over the last
year.  (*Id.* at 75, 80).  The meeting, however, was actually called by either Pierce
or Dr. Coronel to discuss Kendall's poor attitude.  (*Id.* at 69-70, 81).

17.   Dr. Coronel would hold department meetings, at which time Lab Department
personnel were asked if they had any concerns that needed to be addressed.  (*Id.* at
134).  Kendall voiced her concerns about the time delay between when blood was
drawn and when it was tested at these meetings.  (*Id.* at 134-35).

18.   Kendall made a phone call to a Medicare 1-800 hotline in October 2004.  (*Id.* at
146, 148).  She inquired about the regulations for "specimen integrity, turnaround
times, and things of that nature."  (*Id.* at 146).  She did not identify herself or Scott
Memorial and she did not take notes.  (*Id.* at 146-47).

19.   Kendall, along with Abner, also contacted HIPAA.  (*Id.* at 149).  The

representative advised Kendall that she could photocopy patient records and keep

them in order to show where patient quality and patient care was being

compromised.  (*Id.* at 149-50).  The representative did not differentiate between

private-pay and government-pay patients.  (*Id.* at 150).

20.   Kendall began making photocopies of private-pay and government-pay patient

records because she was trying to resolve the problem of specimens sitting too

long before being tested.  (*Id.* at 151).

21.   Kendall photocopied the Lab Department's blood bank logs, choosing pages that

had missing data, due to her familiarity with the State Inspector's audits of

facilities and her training that if the log "isn't completed, [the test] wasn't done."

(*Id.* at 106-107).  She only knows that the logs were not completed, not that the

service was never completed.  (*Id.* at 107-109, 112-14).  Kendall did not have

permission from anyone at Scott Memorial to remove photocopies of patient

records, but she believed she had "permission from HIPAA and Medicare."  (*Id.* at

57, 111).

**D.   Kendall's Termination**

22.   Sometime in 2004, Lab Department employees told Pierce that Kendall was trying

to get him fired and had told coworkers not to volunteer to assist Pierce in any

way.  (Pierce Dep. at 238-40).

23.   At a meeting held on June 9, 2004, to discuss scheduling in the Lab Department,

Kendall told Pierce that she would quit if he kept scheduling eight hour shifts, as opposed to ten hour shifts.  (Pierce Dep. at 228-30; Kendall Dep. at 84).  Kendall then left the meeting before it was over because it was not a mandatory meeting. (Kendall Dep. at 85).  The next day, Kendall received an initial warning counsel from Pierce for abruptly leaving the meeting and for her poor attitude in general. (*Id.*; Pierce Dep. at 229-34).

24.   On June 11, 2004, Pierce and Dr. Coronel again met with Kendall.  (Kendall Dep. at 86-87).  At that meeting, Dr. Coronel and Pierce discussed with Kendall her lack of respect for Pierce and her lack of cooperation in training new employees.  (*Id.* at 88-90).  Kendall indicated that she was unhappy about the scheduling and the frequency of quality control problems within the Lab Department.  (*Id.* at 92-93).

25.   At times, Kendall was responsible for doing the employee scheduling for the Lab Department.  (*Id.* at 53).  On Thanksgiving 2004, Kendall decided to work on the next schedule, but she could not find the necessary form because it was hidden on the lab secretary's computer.  (*Id.* at 54).  Another employee helped Kendall find the computer file and transfer it to a floppy disk so the lab secretary "couldn't keep it from [Kendall]."  (*Id.*).  The lab secretary later complained to Pierce that Kendall had broken into her computer and copied a file.  (Pierce Dep. at 249, 255-57).

26.   In November 2004, an employee advised Pierce that Kendall had gotten a housekeeper to unlock Pierce's office after hours and had then gone inside the office.  (*Id.* at 241-42, 248).  Pierce was missing a personnel document from his

11

office at that time and believed that Kendall had taken it.  (*Id.* at 241-42, 305-12).

27.   Kendall admits that around Thanksgiving she had Pierce's office unlocked so that

she could place a bone marrow specimen on Dr. Coronel's desk, which was also

located in the office.  (Kendall Dep. at 170).  Kendall also admits that she had

Pierce's office unlocked by housekeeping on another occasion to get procedure

manuals and "other things contained in there."  (*Id.* at 170-71).  Kendall knew that

the office was locked so that people could not get into it.  (*Id.* at 171).

28.   Kendall told Pierce that she had "other laboratory files" for "future reference for

inspections or if any–if there was any questions as to what the problems were with

certain specimens."  (*Id.* at 177).  Kendall also admits that she told other

employees that Pierce "needs to go back to Kentucky where he come [sic] from, or

they need to go send him back to Kentucky, because we're not getting any issues

resolved with his technical skills here."  (*Id.* at 178).

29.   Pierce consulted with the Human Resources Director, Katy Hutchinson

("Hutchinson"), about the issues involving Kendall and they decided to suspend

her, pending investigation.  (Pierce Dep. at 249-51, 254-55, 304; Deposition of

Katy Hutchinson ("Hutchinson Dep.") at 72-82, 93-97).  On December 9, 2004,

Kendall was called by Pierce and taken to Hutchinson's office, where she was told

that they had received information requiring an investigation and that she was

suspended.  (Kendall Dep. at 169).

30.   Hutchinson and Pierce investigated the various complaints about Kendall and

decided to terminate her employment.  (Pierce Dep. at 322-24; Hutchinson Dep. at 79-82, 93-97).  Kendall received a letter dated December 16, 2004, terminating her employment.  (Kendall Dep. at 172).

### E.    Abner's Conduct

31.    Abner called HIPAA and Medicare before filing this lawsuit.  (Abner Dep. at 104, 106, 120).  When she called the 1-800 number for HIPAA, the representative referred her to a website that advised Relators that "as long as we were making copies to ensure patients' safety, as long as we didn't show them to nobody else other than a doctor or an attorney or a State employee, then we were within our . . . our rights."  (*Id.* at 108-09, 119-20).  Abner did not identify herself or Scott Memorial when the called the HIPAA and Medicare hotlines.  (*Id.* at 120-22).

32.    Scott Memorial has a system where employees can anonymously submit a written complaint to be investigated by the Risk Management Department.  (*Id.* at 87).  Abner submitted such a complaint, detailing her concerns that specimens were not being tested quickly enough.  (*Id.* at 87-88).  This complaint did not remain anonymous, however, because Pierce saw it and recognized Abner's distinctive handwriting.  (*Id.*).

33.    Between June 2004 and December 2004, Abner made complaints to Pierce on almost a daily basis.  (*Id.* at 106).  Her complaints included: "The blood setting [sic] around too long.  Tests being billed for that we never completed.  Billing for the wrong tests and another test performed in its place.  Credits that were supposed

13

to be given to patients per [Pierce] and they got rebilled again somehow." (*Id.*).

34.     Abner, along with Kendall, contacted Beverly Norton ("Norton") in the Risk Management Department at Jewish Hospital in October of 2004, to voice their concerns about the Scott Memorial Lab Department. (*Id.* at 180). She told Abner to contact Alan Elliott ("Elliott"), the Director of the Jewish Hospital Pathological Lab, and then call her back. (*Id.* at 180-181).

35.     Abner called Elliott and explained the problems with the Scott Memorial Lab Department, including billing for tests before they were completed. (*Id.* at 102-03, 180-81). Abner then called Norton and told her that Elliott said there was very little he could do if Abner wanted to remain anonymous. (*Id.* at 181). Norton told Abner she was going to look into the issue herself. (*Id.*).

36.     Two weeks later, Dr. Coronel called a meeting, saying Elliott had called her about concerns that had been raised. (*Id.* at 186-87). Dr. Coronel issued a memorandum reiterating the Lab Department's policies and procedures. (*Id.* at 187).

### F.    Abner's Termination

37.     Abner received an initial warning counsel from Pierce on November 26, 2004, for being rude and intimidating, having hostile reactions, cursing, and causing discord in the Lab Department. (*Id.* at 139-41). Practically every phlebotomist in the Lab Department had complained about Abner's behavior prior to the November counsel. (Pierce Dep. at 261). Pierce had spoken with Abner about her behavior on two occasions before giving her the warning counsel. (*Id.* at 262).

14

38.     Abner was given a written warning counsel by Hutchinson and Pierce on December 8, 2004.  (Abner Dep. at 147; Hutchinson Dep. at 47).  The written warning counsel was in response to Abner's behavior on December 4, 2004, when she took down a memorandum regarding a new procedure that had been taped to a computer screen and stated that she would not follow it.  (Abner Dep. at 144-46; Pierce Dep. at 272-73, 280).  Abner was instructed in that counsel not to discuss the counsel with anyone in the hospital.  (Abner Dep. at 147; Pierce Dep. at 280; Hutchinson Dep. at 47-49).

39.     On December 9, 2004, Pierce was told by a Lab Department employee that Abner had discussed her written counsel with coworkers.  (Pierce Dep. at 284).  Pierce discussed Abner's insubordination (i.e., discussing her written counsel with other employees after being instructed not to) with Hutchinson and the decision was made to terminate Abner on December 9, 2004.  (*Id.* at 293, 297-98; Hutchinson Dep. at 55-59).

40.     On December 9, 2004, Abner met with Pierce and Hutchinson, who told her that she was being terminated for insubordination for discussing her written counsel.  (Abner Dep. at 149).  Abner denied ever discussing her written counsel with anyone.  (*Id.*).

### G.     Scott Memorial's Knowledge of Relators' Conduct

41.     Dr. Coronel did not identify who had called Elliott to complain about the Lab Department.  (Abner Dep. at 187).  Abner is unsure if Dr. Coronel knew who had

15

called Elliott.  (*Id.*).

42.   Abner did not tell Hutchinson or Pierce prior to her termination that she was going to report Scott Memorial to any state or federal agency.  (*Id.* at 149-50; Hutchinson Dep. at 100-02).  Abner had no intention of reporting Scott Memorial until she was fired.  (Abner Dep. at 136).

43.   As of June 11, 2004, Kendall had not reported Scott Memorial to any state or federal agency.  (Kendall Dep. at 91).  She had no intention of reporting Scott Memorial at that time and had not conveyed to anyone that she might report Scott Memorial to any outside agency.  (*Id.* at 92).

44.   On the morning of December 8, 2004, Relators told John Sheckler ("Sheckler"), a Scott Memorial employee, that there was possible Medicare fraud taking place and that they needed to know who they could trust to talk to without fear of losing their jobs.  (Abner Dep. at 121-23; Kendall Dep. at 102-03).

45.   Later that morning, Sheckler stopped Relators in the hallway and told them that he was not sure who they could go to in order to solve the problem.  (Abner Dep. at 123).  Relators then informed Sheckler that they would just go ahead and call Ken Ziegler, an inspector with the Indiana State Department of Health.  (*Id.*).

46.   Sheckler is Scott Memorial's Public Relations/Marketing Director.  (*Id.* at 124). He was not in Relators' chain of command to report concerns to and he had no authority to address their concerns.  (*Id.* at 124, 131-33; Kendall Dep. at 102).

47.   Sheckler is not part of the administration of Scott Memorial.  (Deposition of John

Sheckler ("Sheckler Dep.") at 5).  He did not convey any Lab Department quality

control or billing issues to anyone at Scott Memorial.  (*Id.* at 31-32).

48.     Pierce never spoke with Sheckler about Relators and never had any conversations

with anyone about Scott Memorial being turned in for fraud by Relators.  (Pierce

Dep. at 318-20).

## IV.     Discussion

### A.     Relators' FCA Claims

Pursuant to the FCA, any person who "knowingly presents, or causes to be

presented, to an officer or employee of the United States Government . . . a false or

fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be

made or used, a false record or statement to get a false or fraudulent claim paid or

approved by the Government" is liable to the government for a civil penalty.  32 U.S.C. §

3729(a)(1),(2).  The Seventh Circuit has explicitly held that in order to survive summary

judgment on a FCA claim, the plaintiff must point to at least one false claim that was

*actually* submitted to the government, not just *probably* submitted.  *United States ex rel.

Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 856 (7th Cir. 2006) (emphasis added)

(citing *United States ex rel. Quinn v. Omnicare, Inc.*, 382 F.3d 432 (3d Cir. 2004); *United

States ex rel. Clausen v. Lab Corp. of Am., Inc.*, 290 F.3d 1301 (11th Cir. 2002); *United

States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995 (9th Cir. 2002)).  This is

because it is the actual claim for payment that is actionable under the FCA, not the

underlying fraudulent or improper conduct.  *See Clausen*, 290 F.3d at 1311 (citations

17

omitted).

In the instant case, Relators have failed to come forward with a single knowingly false claim presented to the government by Scott Memorial.  This failure is fatal to Relators FCA claims.  Accordingly, Scott Memorial is entitled to an entry of summary judgment in its favor on Relators' FCA claims.

To the extent that Relators blame Scott Memorial for their inability to obtain evidence of a specific false claim, their arguments are to no avail.  The case docket reflects Relators' many complaints concerning Scott Memorial's participation in discovery.  Indeed, the court directed Scott Memorial to provide additional discovery on July 7, 2008, and January 27, 2009.  (*See* Docket ## 103, 159).  However, if Relators were still unhappy with the discovery provided by Scott Memorial following the court's orders, they should have filed another motion to compel.  Furthermore, if Relators felt that they were unable to respond to Scott Memorial's motion for summary judgment in the absence of further discovery, they should have filed a motion under Federal Rule of Civil Procedure 56(f) to extend their time to respond until further discovery could be obtained.  Having failed to take these steps, the court finds that Relators cannot blame their failure to establish their FCA claims on Scott Memorial.

### B.    Relators' Retaliation Claims

The FCA provides that:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in terms and conditions of employment by his or her employer because of lawful acts

> done by the employee on behalf of the employee or others in furtherance of
> an action under this section, including investigation of, testimony for, or
> assistance in an action filed or to be filed under this section, shall be entitled
> to all relief necessary to make the employee whole.

31 U.S.C. § 3730(h).  In order to succeed on their retaliation claims, Realtors must

demonstrate that: (1) their actions were taken "in furtherance of" a FCA enforcement

action and were therefore protected by the statute; (2) that Scott Memorial had knowledge

that they were engaged in this protected conduct; and (3) their terminations were

motivated, at least in part, by the protected conduct.  *See Brandon v. Anesthesia & Pain

Mgmt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002) (citing *United States ex rel.

Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)).  The court addresses

each of the necessary elements in turn below.

### 1.    Protected Conduct

In order to fall within the protection of § 3730(h), an employee "must be

investigating matters which are calculated, or reasonably could lead, to a viable FCA

action."  *United States ex rel. Hoppe*r *v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996) (citing

*Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994)).  An employee's investigation

of nothing more than her employer's non-compliance with federal or state regulations is

not sufficient to satisfy the protected conduct requirement.  *Yesudian*, 153 F.3d at 740

(citations omitted).  Rather, "the plaintiff's investigation must concern 'false or

fraudulent' claims."  *Id.* (citations omitted).   Scott Memorial argues that Relators did not

engage in protected conduct because their "investigation" concerned quality control

issues within the Lab Department, not false or fraudulent claims.  Scott Memorial also points to Kendall's admission that she took documents from the Lab Department in an attempt to prove Pierce was an incompetent lab manager.

The court agrees with Scott Memorial that some of Relators' conduct, such as complaints about the quality of the Lab Department's work, do not fall within the protection of § 3730(h).  However, the record reflects that at least a portion of Relators' "investigation" concerned various billing improprieties, which could amount to fraud.  As § 3730(h) is intended to protect employees while they are "put[ting] all the pieces of the puzzle together," *Id.* (citing *Neal*, 33 F.3d at 864), this is sufficient evidence for a jury to find that Relators engaged in protected conduct within the meaning of § 3730(h).

### 2.    Scott Memorial's Knowledge of Protected Conduct

The Seventh Circuit has held that a retaliation claim fails if the employer did not know about the terminated employee's protected conduct before it discharged her. *Luckey v. Baxter Healthcare Corp.*, 183 F.3d 730, 733 (7th Cir. 1999).  Scott Memorial asserts that it had no knowledge of any protected conduct on the part of Relators at the time they were terminated.  Relators argue, however,  that "a jury could reasonably infer that, given Relators repeated complaints about billing improprieties as early as mid-October of 2004 forward, [Scott Memorial was] clearly aware of the very real prospect of having to defend [itself] against allegations of Medicare Fraud . . . ."  (Relators' Response Brief at 25).  However, both parties agree that Relators' job duties included pointing out any billing discrepancies that they noticed.  Accordingly, Relators' complaints of billing

improprieties would not be sufficient to put Scott Memorial on notice that Relators were engaged in protected conduct. *See Brandon*, 277 F.3d at 945 (finding that employer was not on notice of a possible *qui tam* action when employee raised concerns about the Medicare billing practices because this type of monitoring was part of the employee's job).

Relators also argue that Scott Memorial had knowledge of their protected conduct because a reasonable jury could conclude that after Relators told Sheckler that they were concerned that Medicare fraud was taking place, Sheckler immediately went to the CEO of Scott Memorial and told him what Relators had said. However, Relators cite to no evidence to support this assertion. In fact, the evidence on record is that Sheckler did not tell anyone that Relators thought Scott Memorial was committing Medicare fraud. Relators cannot create a genuine issue of material fact by resting on mere speculation.

### 3.    Scott Memorial's Motivation

The final, and most important element of a § 3730(h) claim, is that the employee's termination was motivated, at least in part, by the protected conduct. Scott Memorial asserts that both Kendall and Abner were terminated solely for their bad behavior, as evidenced by the fact that neither Pierce nor Hutchinson (the decision-makers) had knowledge of Relators' protected conduct. Relators argue that the "suspicious timing" of being terminated shortly after speaking with Sheckler supports the inference that Sheckler did, in fact, tell Pierce and Hutchinson of Relators' protected conduct. However, suspicious timing may only permit a plaintiff to survive summary judgment "if there is

21

other evidence that supports the inference of the causal link." *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005) (citing *Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004)).

In the instant case, there is no such evidence.  This is not a case of an employer who suddenly became dissatisfied with a previously satisfactory employee after that employee engaged in protected conduct.  *See id.* ("[A]n employer's sudden dissatisfaction with an employee's performance after that employee engaged in a protected activity may constitute circumstantial evidence of causation") (citing *Lang*, 361 F.3d at 419-21). Relators had both been disciplined for bad behavior prior to their conversations with Sheckler on December 8, 2004.  Furthermore, the reasons for Relators' terminations were well documented by Pierce and Hutchinson.  Accordingly, there is not sufficient evidence for Realtors to survive summary judgment on their retaliation claims.

## V.    Conclusion

For the reasons set forth above, Scott Memorial's Motion for Summary Judgment (Docket # 222) is **GRANTED**.


**SO ORDERED** this 31st day of March 2010.

_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

22

Electronic Copies to:

Rebecca Kay Bethard
KIGHTLINGER & GRAY, LLP
rbethard@k-glaw.com

John L. Caudill
ATTORNEY AT LAW
john@caudilllawfirm.com

Erin Reilly Lewis
UNITED STATES ATTORNEY'S OFFICE
shaq.shockley@usdoj.gov

Richard T. Mullineaux
KIGHTLINGER & GRAY, LLP
rmullineaux@k-glaw.com

Janet S. Nolan
FULBRIGHT & JAWORSKI L.L.P.
jnolan@fulbright.com

Frederick  Robinson
FULBRIGHT & JAWORSKI L.L.P.
frobinson@fulbright.com

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov